IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LINCOLN C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LINCOLN C., A CHILD
UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

BILLY C., APPELLANT, AND ROSALINDA L.,
APPELLEE AND CROSS-APPELLANT.

Filed October 27, 2020.    No. A-20-038.

Appeal from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Jessica R. Meyers, Deputy Scotts Bluff County Public Defender, for appellant.

Danielle Larson, Deputy Scotts Bluff County Attorney, for appellee State of Nebraska.

Leonard G. Tabor for appellee Rosalinda L.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Billy C. appeals and Rosalinda L. cross-appeals from the decision of the county court for Scotts Bluff County, sitting as a juvenile court, terminating their parental rights to their son, Lincoln C. We affirm.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Billy and Rosalinda are the parents of Lincoln, born in 2013. Billy was in prison for a number of years following Lincoln's birth, but was released in November 2018. In August 2019, Lincoln was removed from his home due to concerns of domestic violence between his parents and concerns of Billy's drug use.

On August 29, 2019, the State filed a petition alleging that Lincoln was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he lacked proper parental care by reason of the faults or habits of his parents and/or he was in a situation dangerous to life or limb or injurious to his health or morals in that: his father abused his mother, placing him at risk of harm and/or depriving him of necessary parental care, and his mother was unable or unwilling to protect him; and he lacked safe and stable housing. The State also sought to terminate Billy's parental rights to Lincoln pursuant to Neb. Rev. Stat. § 43-292(2), (4), and (9) (Reissue 2016). The State alleged: Billy substantially and continuously or repeatedly neglected and refused to give Lincoln necessary care and protection; Billy was unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct was seriously detrimental to Lincoln's health, morals, or well-being; Billy subjected Lincoln or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; and termination of Billy's parental rights was in Lincoln's best interests. The State also alleged § 43-292(5) (parent's mental illness or mental deficiency) as a statutory ground for termination, but later withdrew that allegation. The State filed a motion for and was granted temporary custody of Lincoln, and he was placed in the temporary custody of the Nebraska Department of Health and Human Services (DHHS). Lincoln was initially placed with his paternal grandmother, but on September 4 was placed with his maternal grandmother.

On September 4, 2019, the juvenile court ordered there was to be no contact between Billy and Lincoln until further order of the court. However, Rosalinda was allowed to have supervised visits with Lincoln, and could have "informal visits" if her mother was present. Lincoln was placed back with Rosalinda on September 20. On October 2, the court granted Billy's request for visitation and ordered supervised visits via Skype twice a week for 10 minutes each time. Billy was also ordered to complete a parenting assessment.

Also on October 2, 2019, the juvenile court adjudicated Lincoln to be a child within the meaning of § 43-247(3)(a) based on Rosalinda's admissions to the allegations in the petition, which had been amended to "no-fault" allegations against her at the hearing that day. Lincoln continued to be placed with Rosalinda at the time of the hearing. However, he was placed back with his maternal grandmother on October 15.

On October 24, 2019, the State file a motion to terminate Rosalinda's parental rights to Lincoln pursuant to § 43-292(2) and (9). The State alleged: Rosalinda substantially and continuously or repeatedly neglected and refused to give Lincoln necessary care and protection; Rosalinda subjected Lincoln to aggravated circumstances; and termination of Rosalinda's parental rights was in Lincoln's best interests.

After a disposition hearing on October 30, 2019, the juvenile court adopted, and directed the parties to comply with, the DHHS court report and case plan dated October 25, 2019. The

DHHS case plan stated that Rosalinda would: attend and complete Circle of Security and implement the skills learned into her supervised visits; build a positive network of support; complete an "IDI" and follow the recommendations; participate in a women's trauma group; and provide a home that met Lincoln's basic needs. The court amended the court report and case plan to include a parenting assessment.

### 2. TERMINATION HEARING FOR BOTH PARENTS

The termination of parental rights hearing was held on December 16, 2019. Billy was not present at the hearing, but was represented by counsel who was present that day; "according to the best evidence," Billy was in jail in Colorado at the time. Rosalinda and her counsel were present at the hearing.

Patricia Erny, a child and family service specialist, was the ongoing caseworker at the time of the termination hearing. She testified that concerns of domestic violence between Billy and Rosalinda go back to when Lincoln was born in 2013. Erny's understanding from talking to Rosalinda and Billy's mother, and from different law enforcement reports, was that when Lincoln was 6 or 7 days old, Billy and Rosalinda got into a fight. Rosalinda was breast-feeding Lincoln when Billy poured bleach on them. He then stabbed her or cut her when she got into the shower. According to Erny, Billy pushed a couch up against the door and lit the house on fire.

Zackary Douglass, the chief of police in Bayard, Nebraska, testified that in 2013, he was called to a theft at a local convenience store. When he arrived, the clerk told him that Billy had taken a six-pack of beer and a couple packs of cigarettes and walked out the door without paying for the items. Billy was found on the railroad tracks. While Chief Douglass and the sheriff were talking to Billy, "fire calls [to Billy's residence] kept going off over [the] radio." When Billy heard the radio calls, he said something to the effect of "'[Y]eah that's for me.'" They were trying to get Billy to surrender, but Billy "indicated that he was just going to wait for the train to come and just take care of it," which Chief Douglass took to mean that Billy wanted to have a train kill him (Billy). When Chief Douglass told Billy that the railroad had stopped all train traffic, Billy "told us, well, in three minutes either you're going to shoot me or I am going to shoot you," and he had his hands in his pockets. Billy got distracted and the chief and the sheriff "deployed the Taser and got him into custody." After Billy was taken away from the scene by ambulance, Chief Douglass went to Billy's residence.

When Chief Douglass arrived, the "house had been mostly engulfed," but the fire department had put it out. During the investigation, Rosalinda indicated that Billy had been intoxicated and a fight had occurred throughout the morning. Billy poured bleach on her at one point. He also assaulted her with a clothes hanger and cut her hair up while she was in the shower, and he poked her through the shower curtain with a "sword-like" object. Billy kept Rosalinda and Lincoln in the home, threatening them. Before Billy left the residence, he put gas in the middle of the living room floor and used it to light the couch on fire.

As a result of that 2013 incident, Billy was charged in district court with eight counts: terroristic threats (Class IV felony), use of a deadly weapon to commit a felony (Class II felony), first degree false imprisonment (Class IIIA felony), second degree arson (Class III felony), third degree domestic assault (Class I misdemeanor), child abuse (Class I misdemeanor), disturbing the peace (Class III misdemeanor), and possession of a deadly weapon by a prohibited person (Class

III felony); he was also charged with being a habitual criminal (10-year mandatory minimum penalty enhancement). Billy ultimately pled "no contest" to an amended information charging him with first degree false imprisonment, a Class IIIA felony, and attempted arson, a Class IV felony. In January 2014, he was given consecutive sentences of 5 to 5 years' imprisonment and 20 to 60 months' imprisonment; he received credit for 164 days already served. Billy was released from prison in November 2018.

Crystal W., Billy's sister, testified that before Billy went to prison, his relationship with Rosalinda was "toxic." Crystal encouraged Rosalinda to call the police more than once, but that did not happen. After Billy was released from prison, Crystal and Billy had a "good talk" and she "was assured that he was going to take a different path in his life." He was "doing really well" for a while, but "he started going down the wrong way again." Rosalinda shared that she and Billy got into a fight, "[t]here [were] hands put on each other" and a phone was broken, and Lincoln witnessed all of it; there were "multiple occasions." Rosalinda asked Billy to leave on multiple occasions, but he would come back. Crystal could not handle it anymore and stopped associating with Billy in May or June 2019. Crystal observed Rosalinda enabling Billy's behaviors. Before Billy came back, Rosalinda was "an excellent" mother. But after Billy came back, Rosalinda, "unfortunately, chose [Billy] over Lincoln more often than not." Crystal stated, "I don't know if it was even on her own choice. It's just such a toxic place to be for her." Crystal did not believe that Lincoln was safe in the home if Rosalinda and Billy continued in a relationship. Crystal had "never doubted" Billy's love for Lincoln, but in her opinion, "[i]t's just not healthy."

David Kleensang, a deputy with the Morrill County Sheriff's Office, testified that at 6:40 a.m. on May 7, 2019, he was dispatched to a hotel in Bridgeport, Nebraska, where a man, later identified as Billy, was causing a disturbance. When Deputy Kleensang arrived, Billy was at the check-in desk yelling "extreme profanities" at two clerks. Billy was upset that the clerks would not give him a key card. He claimed he owned the motel and that he had $308 million and was entitled to be able to access the room. Deputy Kleensang observed that Billy was sweating profusely, his eyes were dilated, and "his train of thought was all over the place," and the deputy believed Billy was under the influence of some type of drug. Billy was initially arrested for disturbing the peace. During a search incident to the arrest, marijuana was found in a pocket of Billy's pants and a small pipe was found in another pocket. Billy had also been carrying a pack of gum, and inside that pack of gum was a small baggie that had a white substance in it; the baggie was field tested and sent to the lab, and tested positive for methamphetamine. Also inside the pack of gum was a short piece of straw that had residue in it, which the deputy said is something that is used "[f]or inhaling." No children were around Billy when Deputy Kleensang had contact with him.

As a result of that May 2019 incident, Billy was charged in district court with three counts: possession of a controlled substance, methamphetamine (a Class IV felony), disturbing the peace (a Class III misdemeanor), and possession of less than one ounce of marijuana (an infraction); he was also charged with being a habitual criminal (10-year mandatory minimum penalty enhancement). In November, Billy entered into a plea agreement wherein he agreed to plead guilty or "no contest" to an amended information charging him with possession of a controlled substance, methamphetamine, a Class IV felony. While the signed, written plea agreement appears in our

record, our record does not indicate whether the district court ultimately accepted Billy's plea and found him guilty, nor does it indicate Billy's sentence in that case.

Robert McFarland, a police officer with the City of Bayard, Nebraska, testified that in August 2019 he arrested Billy for disturbing the peace and "pedestrian in the roadway" because Billy was walking down the middle of Main Street around 11 p.m. yelling at cars telling them they needed to find God. Officer McFarland testified that initially Billy took off running, but he was able to make contact with him. Billy was "extremely nervous and jittery," and appeared to be under the influence at the time; the officer "guess[ed]" it was "meth," but knew it was not alcohol because a preliminary breath test was conducted. The outcome of the disturbing the peace arrest does not appear in our record.

On August 19, 2019, Krisa Brass, a corporal with the City of Scottsbluff Police Department, and Johnathan Weitzel, an officer with the police department, responded to a domestic disturbance. A neighbor reported that a male, later identified as Billy, had raised his fist to a female, later identified as Rosalinda, and threatened to strike the female, and there was a small child in the home. The neighbor said it was a daily occurrence, and she was concerned for the safety of the child. Corporal Brass spoke with Rosalinda who was "emotional, even kind of distraught initially." The argument between Rosalinda and Billy started when Rosalinda could not find Lincoln, who was later found playing in the neighborhood with other children. Rosalinda told Corporal Brass that she felt intimidated and thought the situation would escalate if law enforcement had not intervened. When Corporal Brass told Rosalinda that there was a chance Billy would go to jail that day, Rosalinda responded that "it wouldn't stop it." Rosalinda also said that a protection order would not stop Billy. While Corporal Brass spoke with Rosalinda, Billy "was trying to get closer, trying to intervene, speaking over her pretty much through the whole contact, so keeping them separated was difficult." When Billy got closer, Rosalinda "would shut down" and was not as open or talkative as she was when Billy was further away.

When Officer Weitzel spoke with Billy during the encounter, he observed that Billy "was sweating profusely, had pinpoint pupils, and was very agitated," signs consistent with drug use. During the encounter, Billy said, "'I don't like bitches who think they have power, and bitch, you don't have power in my world.'" Billy was arrested. However, Rosalinda testified that the "assault by intimidation" case was tried by a jury and was "dismissed because there was no such evidence that [Billy] had physically hurt me or my child."

The above incident on August 19, 2019, was the basis for the juvenile court's order placing Lincoln in the temporary custody of DHHS on August 29, the same day that the juvenile petition was filed.

Sheena Adams, a child and family services specialist with DHHS, conducted initial assessments, wherein she investigated allegations of child abuse and neglect once a report was received from the DHHS hotline. On August 29, 2019, Adams received an order for Lincoln to be removed from his home due to domestic violence between Billy and Rosalinda. Lincoln was initially placed with his paternal grandmother, but that placement ended because it was determined that Billy was having contact with Lincoln at the home. Lincoln was then placed with his maternal grandmother. Lincoln was "forensically interviewed" in early September, but Adams did not observe the interview and she did not recall speaking to anyone that had observed the interview. The forensic interview does not appear in our record, but according to a DHHS court report, during

"a CAC interview" on September 4, Lincoln stated, "'I don't like my dad because they always fight . . . and I don't like that'"; Lincoln also said he did not feel safe with his father when his mother was somewhere else.

Adams spoke with Rosalinda about why Lincoln was removed. "Initially [Rosalinda] said she understood why . . . we had to remove Lincoln and why this investigation had been started, but at the same time she told myself and Specialist Erny that she wasn't afraid of Billy and that she didn't understand why Billy could not see Lincoln." Adams spoke with Rosalinda about the need to protect Lincoln. "The way that I explained it to [Rosalinda] was that [DHHS] was worried that if she continued her relationship with Billy that she or Lincoln or both would end up harmed or dead. And [Rosalinda] said that she still was not afraid of Billy and that she felt that Lincoln needed to have . . . his father in his life." Adams discussed safety plans with Rosalinda. "[Rosalinda] advised that she had . . . basically a safe house, and she kept a ready bag by . . . the door of her home and in her truck in case she had to leave and that she had taught Lincoln a code word that [sic] if she had to get away." When Adams asked Rosalinda why it took DHHS becoming involved for her to make these plans, Rosalinda said she needed DHHS' help to get away. On cross-examination, Adams acknowledged her concern that Rosalinda had a ready bag and a code word for Lincoln. Adams explained her concern by stating, "Because in that setting where the domestic violence is that bad, where she's made that kind of a plan, but then she still says that she wants Billy to be a part of Lincoln's life and that she's not afraid of him, contradicts itself."

Lincoln was placed back with Rosalinda on September 20, 2019. This case was transferred from Adams to Erny on September 25. When Erny took over the case, DHHS was providing in-home family support for Rosalinda and Lincoln, and in September there was a court order for Billy to do two random drug tests by October 2; both were positive for marijuana.

Erny testified that at their first meeting on September 27, 2019, at which Adams was also present, Rosalinda said she had a "safety plan" and had her bags packed and always ready to get away. However, when Erny "asked her on a scale of zero to ten, zero not being afraid at all and ten being afraid, where she was at that point, and she said she was at a four." Rosalinda's long-term plan was to have a safe place for Lincoln and she wanted to move to Colorado. Rosalinda indicated her understanding that from DHHS' perspective, she needed to protect Lincoln from Billy.

Erny talked to Lincoln about domestic violence in the family home. When she met with Lincoln on October 2, 2019, he said he was worried that his parents were fighting and he was scared. And he was worried that if Billy came back, Lincoln was supposed to run to "Nana's house," whom Erny understood was "a lady across the way," but Lincoln "was confused because [Rosalinda] told him not to go over because [Nana's] the one who called the cops on his parents and . . . he was concerned because . . . they were supposed to keep secrets, and he wasn't allowed to talk about it." It concerned Erny that Lincoln was not sure about what he was supposed to do for his plan if his parents started yelling again.

Erny also met with Rosalinda on October 2, 2019. They did a family needs and strengths assessment to figure out next steps. Erny told Rosalinda that Lincoln was afraid; Rosalinda understood, but "started to minimize that." "[S]he just said it was just a misunderstanding, why law enforcement was there the first time" and "she minimized [Lincoln's] concerns, his fears." Erny suggested the "DOVES" program and a trauma support group to Rosalinda, but Rosalinda

said she was busy and did not have time at the moment; she was taking the Circle of Security classes and said she would do the others when she finished.

On October 10, 2019, Erny and Billy discussed the no-contact order between him and Rosalinda, and that he could not have face-to-face contact with Lincoln. We note that a no-contact order between Billy and Rosalinda does not appear in our record. Billy was "frustrated," but "said he understood." Billy felt like DHHS was keeping him away from Lincoln, and he wanted to spend time with his son. "[H]e was tired of playing the peekaboo games and all different stuff at that point of trying to get around it." Erny supervised Skype calls between Billy and Lincoln on October 10 and 13, and both calls went well. However, during the call on October 13, Billy "appeared to be under the influence," "he had droopy eyes, and he was slurring a lot of his speech."

Lincoln was again removed from Rosalinda on October 15, 2019, after DHHS learned that Lincoln had in-person contact with Billy at his paternal grandmother's house, where Rosalinda had taken him. It was also learned that Rosalinda continued to have contact with Billy in spite of a no-contact order. Billy's mother told Erny that Rosalinda had spent the night and that she and Billy talked all the time. Billy's mother also told Erny that one of the attorneys said that Billy and Rosalinda could continue to talk as long as Rosalinda initiated it. After being removed from Rosalinda, Lincoln was again placed with his maternal grandmother.

Rosalinda attended a family team meeting on October 18, 2019, and was told that she was putting her parenting rights at risk if she continued to let Lincoln see Billy, even if it was "for five minutes accidentally" because it violated a court order, and because she "[kept] taking [Lincoln] back over" even though he said he was afraid. According to Erny, Rosalinda understood, but felt Billy deserved to be around Lincoln and she wanted Lincoln to see his father.

Also on October 18, 2019, Erny met Billy at a motel, where he was staying with Rosalinda. Erny was concerned because DHHS had "gotten a call about a domestic between Rosa and Billy." However, Erny did not observe injuries as described by the caller and both Rosalinda and Billy denied anything had happened.

The motion to terminate Rosalinda's parental rights was filed on October 24, 2019. On October 31, Erny was notified that Rosalinda had become the payee for Billy's Social Security disability benefits; his mother had previously been the payee. At a team meeting in November, Rosalinda said that she and Billy were working towards getting an apartment or a house together for financial reasons. Rosalinda was informed that there were still concerns about her being with Billy, and with Lincoln being around Billy "considering the court . . . said only two ten-minute videos per week." Erny stated, "[W]e were just concerned about where it was headed if she kept going down that road, that it didn't show that she was being a protective parent under the circumstances." Rosalinda understood but did not agree, she continued to minimize Lincoln's concerns, and she wanted Billy to be a part of Lincoln's life. By the time of the November team meeting, Rosalinda had completed Circle of Security, but said she did not have time for the DOVES program or the trauma group.

Erny stated that Billy was frustrated and felt like everybody was against him and that DHHS was going to take Lincoln away no matter what. Billy told Erny he was seeing a counselor, but did not tell her the counselor's name. Billy also failed to attend a December 2019 parenting assessment; he told Erny that he did not have transportation and felt everything was pointless. In

her testimony, Erny confirmed that DHHS could have helped with transportation if Billy had requested it.

On December 2, 2019, Erny spoke to Rosalinda about the status of her relationship with Billy. Rosalinda told Erny that she knew getting away from Billy was the only way to get Lincoln home, so she was going to do whatever it took. Rosalinda requested help getting an apartment, a vehicle, and food. Erny provided Rosalinda a list of community resources. Additionally, DHHS allowed Rosalinda to stay with her mother, where she could also spend time with Lincoln. However, at the time of the termination hearing on December 16, Rosalinda was not staying with her mother. Erny stated that Rosalinda "had asked for help with getting an apartment in a text message the other day," but Erny had not yet had an opportunity to speak with Rosalinda and did not know where she was "right at the moment."

At the December 2019 team meeting, Erny told Rosalinda that Erny would be testifying at the hearing. Rosalinda was concerned about losing her son and felt the process was still against Billy. After the team meeting, Rosalinda told that family support worker that she did not consider Billy a threat and she continued to advocate for joint parenting time with Lincoln; the family support worker relayed the information to Erny.

Erny testified that Lincoln was in counseling that had been set up by Rosalinda. During trauma play, Lincoln placed himself as protector over vulnerable stuffed animals and puppets and he pretended to fight off stuffed animals identified as the aggressor.

Billy had two 10-minute video calls with Lincoln each week since October 2019. The video visits "were fine" and Billy was appropriate. Billy did not miss any video visits until the week before the termination hearing when he did not answer attempts to reach him. When Erny spoke to Lincoln the week before the termination hearing and asked him if he wanted to have visits with Billy, Lincoln responded, "'[J]ust please don't leave me alone with him.'" When Erny explained to Lincoln that it would be a video visit and there would always be a worker right there if he did not want to talk to Billy, Lincoln said, "'[P]lease just don't leave me alone[,] [p]lease make sure there's somebody there.'"

Rosalinda was cooperative with Erny. However, Erny was concerned that Rosalinda minimized Lincoln's concerns and still encouraged him to be around Billy and in Billy's life. There were also concerns that Rosalinda tried to coach Lincoln, or clarify what he was saying, during family support sessions.

Erny testified that Billy had talked about his mental health, "[a]nd the schizophrenia . . . and he's also talked about . . . how he wants to get help with the drugs by going to treatment."

According to Adams, based on her training in domestic violence and its impact on children, "Children that are in a household with domestic violence tend to continue that cycle in either a victim role or a perpetrator role. . . . [I]t adds to their adverse childhood experience score, which can cause shorter life expectancy for them," and "[i]t can cause chronic disease."

Rosalinda testified that she completed a Circle of Security class without being told to do it, and she also got Lincoln started in therapy after DHHS could not find a therapist. After some previous confusion about what trauma group she needed, she signed up for a women's trauma group that was to start in February 2020. She said the parent assessment had to be rescheduled twice because she did not have insurance and "they have not got the referral from the LOA," but "if they get the LOA by Friday," Rosalinda had an appointment scheduled for that afternoon.

Rosalinda had supervised visits with Lincoln Monday through Friday from 4 to 8 p.m.; on weekends, her mother was allowed to supervise and Rosalinda was allowed to stay one night with Lincoln at her mother's house. She only missed three visits: one for bad weather, one on her birthday, and one for court. Rosalinda moved into a new apartment in the week prior to the termination hearing.

Rosalinda denied that Billy ever physically hurt Lincoln. She also denied favoring Billy over Lincoln or minimizing concerns. Rosalinda stated, "I care about my son more than anything. I don't minimize his fears. I don't minimize his concerns. I take into consideration everything he says. I listen to what he says, and I figure out a plan. I do not choose [Billy] over my son." She also stated she was not currently associating with Billy and she had no future plans with him. "I am trying to focus on getting my son back so we can continue on living our lives." Rosalinda confirmed her understanding that if she continued a relationship with Billy that she was in jeopardy of losing her rights. On cross-examination, Rosalinda acknowledged that she had been living with Billy up until 2 weeks prior to the termination hearing. And when asked if she had been "served with a termination of parental rights" approximately 2 weeks ago, Rosalinda responded, "Yes." She also confirmed that she was still Billy's payee. When asked if she foresaw Billy continuing to have a relationship with Lincoln, Rosalinda responded, "As long as he stays clean and sober . . . and takes the proper measures to maintain a healthy and safe environment for our son." When asked when that became her stance, Rosalinda responded, "The beginning of November."

Rosalinda's mother testified that she did not like the way Billy treated Rosalinda or the way he talked to her. When asked if she had ever been afraid for Rosalinda, Rosalinda's mother responded affirmatively.

The parties made their closing arguments, as did Lincoln's guardian ad litem, who joined with the comments of the State and argued that termination was appropriate. The juvenile court stated on the record that the evidence was clear and convincing that the State had proved statutory grounds for terminating Billy's parental rights, and that it was in Lincoln's best interest that his rights are terminated. The court opined, "based upon the testimony and the evidence today, [Billy] . . . is a bomb with a short fuse, and this child needs to be away from him." The court also found that the State met its burden of proof on the statutory grounds for terminating Rosalinda's parental rights. However the court was "struggling" with the best interests issue regarding Rosalinda. The court stated:

> And that's what I am struggling with based upon what the caseworker said, which was there is an incredibly strong bond between you and your child, and based upon . . . the boy's aunt's testimony that you were an exceptional mother when Billy . . . was in prison and that no one would ever have questioned your ability to parent when he was not around.
>
> So what I've got to do is I have got to weigh that and what might -- the effect that separating you from your child might have on him because my concern's for him. . . . So I have got to consider the effect that might have on him versus my concern that [Billy] will be allowed back in his life based upon the testimony and the evidence today, not what you have said.

You have said some of the right things today. The question is whether those are believable based upon the history. And so those are the two things I have got to weigh.

The court took the best interest portion under advisement.

### 3. JUVENILE COURT'S DECISION

In an order entered on January 13, 2020, the juvenile court terminated Billy's parental rights to Lincoln after finding by clear and convincing evidence statutory grounds for termination existed pursuant to § 43-292(2), (4), and (9), and that termination of parental rights was in the child's best interests. The juvenile court also terminated Rosalinda's parental rights to Lincoln after finding by clear and convincing evidence statutory grounds for termination existed pursuant to § 43-292(2) and (9), and that termination of parental rights was in the child's best interests.

Billy appeals and Rosalinda cross-appeals the juvenile court's order.

## III. ASSIGNMENTS OF ERROR

Summarized, Billy assigns that the juvenile court erred in finding that terminating his parental rights was in Lincoln's best interests.

Summarized, Rosalinda assigns on cross-appeal that the juvenile court erred in finding (1) statutory grounds existed to terminate her parental rights and (2) termination of her parental rights was in Lincoln's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In terminating Billy's parental rights to Lincoln, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect of juvenile); (4) (parent unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by court to be seriously detrimental to health, morals, or well-being of juvenile); and (9) (parent subjected juvenile or another minor child to aggravated circumstances). And in terminating Rosalinda's parental rights to Lincoln, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) and (9).

Although only Rosalinda assigns error to the juvenile court's finding that statutory grounds exist for terminating parental rights, we address it as to both parents because a finding of such grounds is necessary before terminating a parent's rights to a child.

Section 43-292(2) generally provides for termination of parental rights when the parent has neglected and refused to give the necessary care to the juvenile or a sibling of the juvenile. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). "One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2)." *In re Interest of Joseph S. et al.*, 291 Neb. 953, 961, 870 N.W.2d 141, 148 (2015). "A parent may as surely neglect a child of whom she [or he] does not have possession by failing to put herself [or himself] in a position to acquire possession as by not properly caring for a child of whom she [or he] does have possession." *In re Interest of J.N.V.*, 224 Neb. 108, 112, 395 N.W.2d 758, 761 (1986).

### (i) Billy

Billy spent the majority of Lincoln's life in prison for convictions related to an incident that occurred when Lincoln was approximately 1 week old wherein Billy threatened and caused injury to Rosalinda while Lincoln was present, and Billy set their house on fire. During his incarceration, Billy was unable to parent Lincoln. After his release from incarceration in November 2018, Billy did well for a short period of time, but soon began exhibiting erratic behaviors and engaged in drug use. There was testimony from Billy's sister that Rosalinda and Billy would fight, and Rosalinda told her that "[t]here [were] hands put on each other," and that Lincoln witnessed all of it; it also occurred on "multiple occasions." Billy also violated the no-contact order by having in-person contact with Lincoln. Our de novo review of the record clearly and convincingly shows that grounds for termination of Billy's parental rights under § 43-292(2) were proven by sufficient evidence.

### (ii) Rosalinda

The evidence presented at the termination hearing was that Rosalinda failed to protect Lincoln from Billy. Lincoln was present for "multiple" altercations between Rosalinda and Billy. Lincoln told the caseworker that he was "scared" and that he was supposed to run to "Nana's house" if Billy came back, but he was also confused because Rosalinda told him not to go to Nana's house because she was the one who called law enforcement. Lincoln also reported having to keep secrets. And despite a no-contact order preventing Billy from having in-person contact with Lincoln, there was evidence that Rosalinda allowed such contact; this occurred after Lincoln was placed back in her home, and resulted in a subsequent removal from her home. Furthermore, Rosalinda advised the caseworker that she had a "ready bag" in case she had to leave, and had taught Lincoln a code word, but at the same time said she was not afraid of Billy and wanted Billy to be a part of Lincoln's life. Rosalinda continued to have repeated contact with Billy even though she knew it could jeopardize her parental rights to Lincoln. She ultimately failed to put herself in a position to get Lincoln back. Our de novo review of the record clearly and convincingly shows that grounds for termination of Rosalinda's parental rights under § 43-292(2) were proven by sufficient evidence.

(b) Remaining Grounds for Termination

We need not consider whether termination of Billy's parental rights was proper pursuant to § 43-292(4) and (9), or whether termination of Rosalinda's parental rights was proper pursuant to § 43-292(9), since any one of the 11 grounds identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S., supra*. Thus, the next inquiry is whether termination was in Lincoln's best interests.

2. BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

(a) Ruling Related to Billy

Billy was in prison for all but approximately 1 year of Lincoln's life before the termination hearing. During that year, Lincoln witnessed domestic instances between his parents, and Rosalinda said she taught Lincoln a code word in case they needed to leave. Lincoln was scared. One week prior to the termination hearing, while discussing Lincoln having visits with Billy, Lincoln told the caseworker, "'[P]lease just don't leave me alone[,] [p]lease make sure there's somebody there.'" Throughout Lincoln's life, Billy has never been able to consistently meet his parental obligations to Lincoln. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). We find that the State has rebutted the presumption of parental fitness as to Billy. We further find that there is clear and convincing evidence that it is in the best interests of Lincoln to terminate Billy's parental rights.

(b) Ruling Related to Rosalinda

Although Rosalinda was "an excellent" mother when Billy was in prison, once he was released, her relationship with Billy appeared to take precedence over her need to protect Lincoln.

Although Rosalinda said she placed Lincoln first over being with Billy, her actions have been contradictory. And while she had a bag ready in case she and Lincoln needed to get away from Billy, she nevertheless stated that she was not afraid of Billy and believed he should be in Lincoln's life. Even after the motion to terminate her parental rights was filed in October 2019, she and Billy were working on getting an apartment or a house together. When Rosalinda was informed that there were still concerns about her being with Billy, and with Lincoln being around Billy, Rosalinda understood but did not agree, again stating that she wanted Billy to be a part of Lincoln's life. In December Rosalinda told Erny that she knew getting away from Billy was the only way to get Lincoln home, and she was going to do whatever it took. However, after a team meeting in December, Rosalinda told that family support worker that she did not consider Billy a threat and she continued to advocate for joint parenting time with Lincoln. At the termination hearing, Rosalinda testified that she cared about Lincoln more than anything, and that she did not choose Billy over Lincoln. She also stated that she was not currently associating with Billy and she had no future plans with him. However, on cross-examination, Rosalinda acknowledged that she had been living with Billy up until 2 weeks prior to the termination hearing, and she was still the payee for Billy's Social Security disability benefits.

At the end of the termination hearing, the juvenile court was "struggling" with the best interests issue regarding Rosalinda, stating, "You have said some of the right things today. The question is whether those are believable based upon the history." It took the matter under advisement. Subsequently, in its written order, the court stated, "The evidence is undisputed that [Rosalinda] is a good parent when [Billy] is behind bars." However, she "[was] clearly conflicted and refuse[d] to see the reality and scope of [Billy's] threat to Lincoln and, in truth, herself." The court continued by stating:

> [Rosalinda] espoused an incredible change in position just days before the termination trial; apparently changing her mind about the benefits of a relationship with [Billy]. *The court is not persuaded.* Past behavior is a good predictor of future behavior. The history of the relationship between [Billy] and [Rosalinda] is one of violence, drugs, and intimidation by [Billy] and a willingness to continue the relationship by [Rosalinda]. The nightmare [Rosalinda] and Lincoln lived through six years ago was not enough to persuade [her]. Separation for five years while [Billy] was incarcerated was not enough to persuade [her]. Recent methamphetamine use by [Billy] since his return was not enough to persuade [her]. Drunken and beligerant [sic] behavior since [Billy's] return was not enough to persuade [her]. A complete loss of control and anger during a domestic abuse investigation was not enough to persuade [her]. Lincoln's vocalized fear of his father was not enough to persuade [her]. All of these factors together were not enough to persuade [her]. Only when [Rosalinda] was face to face with this motion to terminate parental rights did she become persuaded to *say* she did not want [Billy to be] a part of Lincoln's life. *The change of heart is not believable. This court firmly, beyond a reasonable doubt, believes [Rosalinda] will seek [Billy's] companionship as soon as this case is completed* or upon [his] release from incarceration should the case close before he is free. The risk of harm to Lincoln would be tremendous. This court agrees with CFS workers; the risk includes death.

Thus, the court finds, by clear and convincing evidence, it is the best interest of Lincoln to have the parental rights of [Rosalinda] terminated.

(Bold emphasis in original.) (Emphasis supplied.)

On our de novo review of the record, like the juvenile court, we find this to be a very difficult decision. That said, we agree with the juvenile court's assessment. See *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009) (when evidence is in conflict, appellate court may consider and give weight to fact that trial court observed witnesses and accepted one version of facts over the other). Rosalinda, by her actions, has continued to choose Billy over Lincoln, even during a time when her parental rights to Lincoln were at stake. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. at 872, 744 N.W.2d at 65. Although there is certainly evidence to indicate that Rosalinda intended to put Lincoln's needs above her wish to maintain ties with Billy or to keep Billy involved in Lincoln's life, her actions simply have not been consistent with that intent. We find that the State has rebutted the presumption of parental fitness as to Rosalinda. We further find that there is clear and convincing evidence that it is in the best interests of Lincoln to terminate Rosalinda's parental rights.

## VI. CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Billy's and Rosalinda's parental rights to Lincoln.

AFFIRMED.